

# IN THE
# TENTH COURT OF APPEALS

_____

## No. 10-20-00075-CV

_____

## IN THE INTEREST OF
## M.K. AND E.K., CHILDREN

_____

**From the 272nd District Court
Brazos County, Texas
Trial Court No. 18-002302-CV-272**

_____

## MEMORANDUM OPINION

_____

After a jury trial, the parental rights of Appellants Joni J. ("Mother") and Jeffery K. ("Father") were terminated as to their children, M.K. and E.K. The jury additionally found that Appellant Cynthia E. (the paternal "Grandmother") should be removed as permanent managing conservator ("PMC") of M.K. and E.K. All three parties have appealed. We affirm.

### *Issues*

The Department alleged three predicate violations against Mother and Father to justify termination: (1) they knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-

being of the children; TEX. FAM. CODE ANN. § 161.001(b)(1)(D); (2) they engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; *id.*, § 161.001(b)(1)(E); and (3) they knowingly engaged in criminal conduct that has resulted in their convictions of an offense and confinement or imprisonment and inability to care for the children for not less than two years from the date of filing the petition; *id.*, § 161.001(b)(1)(Q). The Department also asserted that termination was in the best interest of the children.

The Department alleged that Grandmother should be removed as PMC because: (1) the circumstances of M.K. and E.K. or of Grandmother materially and substantially changed since she was appointed permanent managing conservator; *id.*, § 161.004(a)(2); and (2) the removal of Grandmother as permanent managing conservator was in the children's best interest. The jury found that Mother and Father committed the predicate violations alleged by the Department, that termination was in the children's best interest, and that the parental rights of Mother and Father should be terminated. The jury additionally found a material and substantial change in circumstances occurred and that Grandmother should be removed as PMC.

Mother presents one issue: The evidence was factually insufficient to support the jury's best-interest finding.

Father presents the following issues:

1.     The evidence is legally and factually insufficient to support the jury's findings that termination of Father's parental rights was in the best interest of M.K. and E.K.

2.     The evidence is legally and factually insufficient to support the jury's findings of any of the predicate grounds for termination of Father's parental rights to M.K. and E.K.

3.     The evidence is legally and factually insufficient to support the jury's findings that Father's parental rights to M.K. and E.K. should be terminated.

Grandmother presents the following issues:

1.     The evidence is legally and factually insufficient to establish that there was a material or substantial change of circumstances since entry of the final order less than three months earlier.

2.     The State failed to provide the requisite affidavit for seeking modification within one year of a final order.

3.     The evidence is legally and factually insufficient to establish that modifying the recent final order was in the children's best interest.

### *Standard of Review*

All appellants, in whole or in part, allege that there is insufficient evidence to support the jury's verdict.

Termination of parental rights requires proof by clear and convincing evidence. *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam); TEX. FAM. CODE ANN. § 161.001(b). The quantum of proof in a conservatorship decision is by a preponderance of the evidence. *Zeifman v. Michels*, 212 S.W.3d 582, 589 (Tex. App.—Austin 2006, pet. denied). In the appellate court, a jury's findings underlying a termination and a conservatorship decision are subject to legal and factual sufficiency review. *In re P.A.C.*, 498 S.W.3d 210, 214 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

> The standards of review for legal and factual sufficiency in termination cases are well established. *In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual

sufficiency). In reviewing the legal sufficiency of the evidence, we view all the evidence in the light most favorable to the finding to determine whether a trier of fact could reasonably have formed a firm belief or conviction about the truth of the Department's allegations. *In re J.L.*, 163 S.W.3d 79, 84-85 (Tex. 2005); *J.F.C.*, 96 S.W.3d at 265-66. We do not, however, disregard undisputed evidence that does not support the finding. *J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re C.H.*, 89 S.W.3d at 25. We must consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

*In re W.D.*, No. 10-18-00339-CV, 2019 WL 1291111, at *1 (Tex. App.—Waco Mar. 20, 2019, no pet.) (mem. op.).

If multiple predicate violations are found by the factfinder, we will affirm based on any one ground because only one is necessary for termination of parental rights. *In re J.S.S.*, 594 S.W.3d 493, 503 (Tex. App.—Waco 2019, pet. denied).

We give due deference to the factfinder's findings and must not substitute our judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole judge "of the credibility of the witnesses and the weight to give their testimony." *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). The factfinder may choose to believe one witness and disbelieve another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). Although a factfinder is free to disbelieve testimony, "in the absence of competent evidence to the contrary, it is not authorized to find that the opposite of the testimony is true." *In re F.E.N.*, 542 S.W.3d 752, 765 (Tex. App.—Houston [14th Dist.] 2018, pet. denied, 579 S.W.3d 74 (Tex. 2019)).

*Trial Testimony*

The Department of Family and Protective Services (the "Department") received a report on January 29, 2018 that M.K. and E.K. were being negligently supervised due to the use and distribution of methamphetamine by their parents.[1] E.K., who was two years old at the time, was reported to have found a syringe in the home. Mother tested positive for methamphetamine and amphetamine after a drug test. The allegations of neglectful supervision were found "reason to believe," and the children were removed from the home and initially placed with Grandmother. After an altercation between Grandmother and Father, after which Grandmother was arrested for outstanding tickets, the children were placed with Father's sister ("Sister"). Sister was able to care for the children only for a short period of time. Grandmother was released from jail but did not have a suitable residence. The children were placed with a relative of Mother's who was to supervise Mother's interactions with the children. However, the relative was also suspected of using illegal drugs. The Department filed for emergency removal of the children on May 7, 2018, and they were placed back with Grandmother. Grandmother moved into the parent's apartment to care for the children.

Grandmother requested that she be appointed PMC of the children. Mother and Father both supported this appointment. After an evaluation by the Department, Grandmother was appointed PMC of M.K. and E.K. on June 28, 2018. Mother and Father retained possessory conservatorship. Two caseworkers and a supervisor testified that

---

[1] Two prior reports to the Department in reference to M.K. and E.K. were ruled out.

Grandmother agreed to supervise the children appropriately and to enroll E.K. in speech therapy. Mother and Father agreed to move to a new residence. Grandmother also agreed to make sure that the parents were not using drugs before allowing any unsupervised contact with the children. A drug test administered on Grandmother by the Department was negative.

On September 11, 2018, a Department investigator went to Grandmother's apartment after receiving reports that Grandmother was using drugs and mistreating the children. One of the caseworkers testified that the investigator interviewed a man ("J.S.") that the investigator observed stealthily leaving Grandmother's apartment. J.S. told the investigator that he had been staying with Grandmother and the children for a week or so, although he did not live there. J.S. further told the investigator that he slept in M.K.'s and E.K.'s bedroom and that he would sometimes babysit the children. The investigator administered an instant oral drug test on J.S. that tested positive for methamphetamine and amphetamine.

Grandmother admitted to the investigator and to caseworkers that she had used a rinse on her hair in order to conceal the fact that she had used an unprescribed pain pill. Grandmother testified that she was afraid the pills would show up on the drug test the Department administered which would prevent her appointment as PMC. Grandmother also admitted to the investigator and caseworkers that she used methamphetamine supplied by her upstairs neighbor on one occasion after she was appointed PMC. Grandmother explained that she was unable to afford the prescription she was taking for her opioid addiction, and the neighbor told her the methamphetamine would alleviate

any withdrawal symptoms. A caseworker testified that Grandmother also admitted she failed to disclose that she was previously treated for opioid addiction and treatment. Grandmother tested positive for methamphetamine after the investigator performed an instant oral drug test on her. One of the Department caseworkers testified that Father said he supplied Grandmother with methamphetamine.

A caseworker testified that Grandmother disclosed that J.S. has mental health issues and uses both methamphetamine and heroin, but that Grandmother allowed him to babysit the children and to sleep in the children's room. Grandmother testified at trial that she never left J.S. alone with the children and that J.S. slept in the children's bedroom while the children slept with her.[2]

Department caseworkers testified that both Mother and Father subsequently admitted they knew Grandmother had a history of abusing alcohol and controlled substances and knew she falsified the drug test, but they did not disclose what they knew to the Department. Mother testified that she did not disclose these issues to the Department before agreeing for Grandmother to be appointed PMC in order to prevent the children from going into foster care and because, "[i]t wasn't my business." Both Mother and Father told one of the caseworkers that they did not believe Grandmother was a safe caregiver for the children.

---

[2] The report to the Department alleged that J.S. had sexually abused M.K., although a forensic interview was inconclusive. One of the caseworkers testified that M.K. never made an outcry of abuse against J.S. but M.K. did say that Father hit her in the eye and in the forehead.

Grandmother admitted to the caseworkers that she allowed Mother and Father to take the children with them to the hotel in which they were residing, even though Grandmother knew that both were using illegal narcotics while the children were in their care. One of the caseworkers testified Father admitted that he was a heroin addict and that he smoked heroin in the hotel room when the children were present, although he did so in the bathroom with the door closed. Father also admitted he used methamphetamine, and he used drugs in the automobile used to transport the children, although he noted that he did not do so when the children were in the vehicle. One of the caseworkers testified that Mother admitted knowing Father used drugs while the children were in their custody. Mother also admitted that she knew Father sold drugs. Mother admitted to at least one of the caseworkers that she knew how to fake a drug test and had done so.

The caseworkers testified that Mother and Father admitted they did not move out of the apartment with Grandmother and the children until August 2018 after a fight between Mother and Grandmother. Grandmother also never arranged speech therapy for E.K. Grandmother testified that she was working with E.K. herself as one of Grandmother's children also had speech problems.

M.K. and E.K. were removed from Grandmother's custody and placed with an unrelated foster family. After administration of drug tests, both children tested positive for methamphetamine, and E.K. additionally tested positive for heroin. Approximately one week after the children were removed from Grandmother's custody, Mother and Father were arrested for manufacture/delivery of methamphetamine. The arresting

officer testified that a search of their vehicle resulted in the discovery of approximately 36.3 grams of methamphetamine and 11.1 grams of THC oil. Police also discovered drug paraphernalia and drug packaging materials. A large amount of the methamphetamine was found in Mother's purse, along with a drug ledger. Also discovered was a prescription bottle in Grandmother's name that contained Xanax and Hydrocodone. Father told the arresting officers that the drugs were his and that Mother had not been using drugs. Father admitted to the officers that he had been using heroin. After their arrest, Mother and Father remained in custody throughout the remainder of the case. Both pled guilty and were sentenced to terms of incarceration—five years for Mother and eight years for Father.

Mother and Father have additional criminal histories. Father has been involved in criminal activity since he was a teenager and has been incarcerated for a large portion of the lives of both children. Mother has also spent a good portion of the children's lives in jail. M.K. was born in August 2014, and E.K. was born in November 2015. Within a month of M.K.'s birth, Mother was sentenced to six months in jail. While pregnant with E.K., Mother was incarcerated again for a probation violation. Prior to E.K.'s birth, Father was sentenced to 180 days in jail after pleading guilty to theft of property. Father was incarcerated in Louisiana for possession of methamphetamine with intent to distribute from March 26, 2016 until his parole on November 1, 2017. Mother admitted that she was "there" with Father during the events that led to this incarceration, although letters written to Mother by Father indicate a deeper involvement. Father attempted to get Mother to take responsibility for the drugs found by the police in their recent arrest and

to not leave him "high and dry" as she did in Louisiana. Father wrote, "I saved your ass twice from going to prison," and continued:

> [W]e were side by side every minute of every fucking day both times we got caught so just as bad as I deserve to be here! So do you!! And your lucky I love you so fucking much that not once but twice I'm going to prison because I love you.

During the period of time when the Department first began investigating in January 2018 and the children's removal in September 2018, Mother was arrested for theft of property and tested positive for methamphetamine in two drug tests. Father was arrested for possession of methamphetamine, possession of heroin, and unauthorized use of a motor vehicle.

After the children were removed from her custody, Grandmother was arrested for assault on a roommate, although the charges were later dismissed when the roommate elected not to pursue the matter. Grandmother also has a previous conviction related to concealing her then-husband's whereabouts from police.

While Father was incarcerated in Louisiana, Mother and Grandmother were involved in two domestic violence incidents that required police intervention. After one incident, Mother was cited for disorderly conduct. The children were present during both incidents, although the violence was not directed at them. The police officers who responded to the incidents testified that they did not believe the children were in danger or that Department intervention was necessary.

Department caseworkers testified that Mother also has an extensive history with the Department. Mother's two oldest children, T1 and T2, who are not Father's children,

were the subject of numerous Department investigations beginning when T1 was two weeks old. The allegations included use of illegal narcotics, neglect, domestic violence, instability, unclean living conditions, and developmental delays exhibited by both children. Mother was placed on family-based safety services twice while the Department investigated the various reports. Mother completed the services and various courses required by the Department. However, Mother eventually agreed to placement of T1 and T2 with their paternal grandmother in 2014. The paternal grandmother died in 2018, and T1 and T2 were placed with a paternal aunt. At the time of trial, Mother had seen T1 and T2 in person only once in five years.

After the children were placed in foster care, Grandmother was allowed supervised visitation. One of the Department caseworkers testified that Grandmother had to be admonished more than once regarding the inappropriate comments she made to the children and the sugary treats she would bring to them. The caseworker additionally noted that Grandmother smelled strongly of alcohol on one visit and subsequently tested positive for alcohol. Grandmother also spent the majority of her time during the visitations with M.K., largely ignoring E.K. Grandmother's visitation was suspended by the Court for a number of months due to her inability to follow the Department's rules, but the visits were reinstated shortly before trial. One of the caseworkers testified that the children never asked to see or speak with Grandmother during the suspension.

The psychologist who evaluated Grandmother for the Department testified that she has an inability to admit faults, which will inhibit any attempt to address her problems. The psychologist also noted that Grandmother demonstrated poor judgment and that placing the children in her care could be dangerous.

One of the caseworkers and the foster mother testified about the condition of the children when they were first placed with the foster parents. M.K. had difficulty showing any type of appropriate attachment to adults. M.K. was shy and timid, but very attention seeking. The foster mother described her as "selfish," "very manipulative," and "lying profusely." After months in their care, she has become more outgoing.

E.K. had behavioral issues that resulted in daily calls from his daycare and being terminated from one daycare. E.K. was hyperactive and, at times, violently physical. The foster mother testified that she was told that E.K. was deaf when he was first placed with her family. E.K.'s hearing was normal after the foster parents had him tested, but he had a delayed speech issue. M.K. also had some speech issues, but they were less significant than E.K.'s. The foster parents enrolled E.K. in speech therapy, and his speech has improved. E.K.'s violent tendencies and anger issues have also resolved.

M.K. and E.K. did not have a close sibling relationship when they were first placed with the foster family, but their relationship has since strengthened. Both children were also constantly sick when they first entered foster care but are now healthy.

Mother, Father, and Grandmother testified about their unfortunate family situations, each being exposed to verbal, emotional, physical, and/or sexual abuse.

A. Mother. Mother testified that she was the oldest of seven children and helped raise her younger siblings. Mother became pregnant at sixteen and had her first two children, T1 and T2, by the age of eighteen. Mother testified that she had a hard time because she was a teen-aged, single mother who had to drop out of school and who was trying to help a younger brother who was experiencing problems with drugs. The relationship with the father of T1 and T2 lasted five years and was marked by his verbal abuse and drug use. Mother testified that she was investigated by the Department a number of times, but that the majority of the reports were determined to be not proven. Mother testified that she agreed to separate from the father after the Department gave her the ultimatum of leaving him or losing the children. Mother testified that she moved around a lot after that and asked T1's and T2's paternal grandmother for help. Mother then entered into an agreement for the grandmother to care for T1 and T2. Mother noted that the Department's case against her, as it related to T1 and T2, was closed after she completed all of the required services. Mother testified that she attempted to maintain a relationship with T1 and T2, but the paternal grandmother cancelled all of the visits she planned except for one in May 2015. Mother testified that she tried to see T1 and T2 on a number of occasions and that she left them school clothes, school supplies, and other things when she was not allowed to see them. Mother testified that although she could not meet with T1 and T2 in person, she communicated with them often through telephone calls and Facetime.

Mother testified that she then re-connected with Father, who she first met when they were younger. Mother moved to Louisiana to live with Father. Mother testified that

she and Father had a great relationship until after M.K. was born. Mother testified that while she was in jail for a probation violation, Father began a relationship with another woman. Mother and Father reunited in Texas after Father was paroled in Louisiana, continuing an on-again/off-again relationship that Mother classified as "toxic." Mother testified that she learned from the classes she attended while incarcerated in Texas that she and Father did not have a healthy relationship and did not communicate effectively with each other. Mother testified that she felt like she was trapped in an abusive relationship, but that she was afraid to leave because she had nowhere else to go and would be unable to be around her children. Mother noted that she is no longer in a relationship with Father. When asked if she intended to have a relationship with Father in the future, Mother responded, "At this point no."

Mother testified that she relied on the Department to fully investigate Grandmother as a possible caretaker for M.K. and E.K. She noted, "[I]n my eyes if they approved her, then it had to have been a good situation to put the kids in or [t]hey wouldn't have done it." Mother testified that she had no idea Grandmother was using methamphetamine or had a criminal history and that she would not have agreed for Grandmother to become PMC if she had known.

Mother also denied that she and Father continued to live with Grandmother after Grandmother was appointed PMC, although she admitted that they saw the children frequently and unsupervised until she and Grandmother had another argument.

Mother denied that she was using drugs when she and Father were stopped by the police and arrested in September 2018. Mother also denied any knowledge of the

drugs in her purse and testified that she only entered a guilty plea because, "I was afraid that I was going to be incarcerated for the length of time that I would not be able to have the opportunity to get out and get my children back." Mother admitted that she tested positive for methamphetamine and amphetamine after oral swab and hair tests in March 2018. Mother testified that she had not used any controlled substances since that time.

B. Father. Father testified that he also experienced a turbulent home life, moving back and forth between Texas and Louisiana after his parents divorced. Father spent the majority of his youth with his mother, who was married and divorced a number of times. Father testified that many of his mother's relationships were abusive and some of the abuse was directed at him when he tried to physically protect her. Father noted that he also experienced considerable verbal and emotional abuse.

Father testified that he started smoking marijuana at the age of thirteen and was kicked out of school when he was sixteen. Father was sent to court-ordered rehab after he tested positive for opiates and marijuana and was placed on probation until he was eighteen for assaulting a teacher. Father admitted that he also had arrests for shoplifting and possession of marijuana, for which he served short jail sentences.

Father testified that he moved to Louisiana to live and work with his father in order to avoid further problems. Father testified similarly to Mother about their reconnection, parenthood, and relationship problems. Father admitted that his incarceration in Louisiana was the result of his use and distribution of methamphetamine but denied that Mother was involved. Father acknowledged that his letters implicated

Mother, and he had no explanation other than he was upset and trying to put the blame on someone else when he wrote them.

Father testified that he moved to Texas to reunite with Mother and the children after his release from prison in Louisiana. Father described their relationship as "rocky."

Father testified that he agreed to Grandmother being appointed PMC because he had no idea that Grandmother was using drugs or abusing alcohol. Father knew that Grandmother used pain pills in the past because she was in a car accident and injured her back. Father did not think Grandmother was still using the pain pills because the accident happened approximately fifteen years ago. Father stated that if he had known that Grandmother had a drug or alcohol problem, he would not have agreed to her appointment as PMC.

Father denied that he told the caseworkers that he and Mother stayed with Grandmother after she was appointed PMC, but he admitted that Grandmother allowed them unsupervised access to the children.

Father admits that he told the caseworkers that he was using heroin, but he testified that he only used it for two months in 2018. Father also admitted that he smoked heroin in the bathroom of the hotel, but he testified that the children were not in the room when he did so. Father denied that he ever used drugs around the children or that he was ever under the influence of drugs while he was around them. Father also noted that he refrained from using drugs between the time of his parole in November 2017 and the initial Department intervention in January 2018.

Father testified that Mother was in the hotel room when he smoked heroin in the bathroom and that she knew that he used and sold drugs. Father denied, however, that Grandmother knew that he sold drugs.

Father also admitted that he told the caseworker he provided methamphetamine to Grandmother, but he stated that he merely agreed with the caseworker when she told him that Grandmother said she got her drugs from him. Father's explanation was that he lied in order to cover up Grandmother's lie.

Father testified that even though he never used drugs around the children, he accepts responsibility for them testing positive because of the children's contact with him. Father was told that children could get drugs in their system just by contact with someone who used drugs. Father believed it was likely that the children's exposure was the result of spending time in the hotel room where he and Mother were staying and being in the vehicle where he also used drugs. Father had no other explanation for the children testing positive other than them possibly being exposed through J.S.

C. Grandmother. Grandmother testified that she first used pain pills after a car accident and began using them again as a coping mechanism when her ex-husband, Father's father, died. Grandmother's daughter helped her realize that she had a problem, and Grandmother went to her doctor for assistance. The doctor prescribed medication, which Grandmother continued to take until she was appointed PMC. Grandmother testified that she lost her job as a result of caring for the children and that she could no longer afford the medication. Grandmother admitted that she obtained methamphetamine from her upstairs neighbor because she was told it could alleviate the

withdrawal symptoms from the opioid medication. Grandmother testified that she used the methamphetamine only that one time, although she admitted to the psychologist who evaluated her at the Department's request that she also used methamphetamine approximately seven years previously.

Grandmother admitted that before she was appointed PMC, she had two or three glasses of wine a night. Grandmother testified that she did not drink to the point of drunkenness and did not realize that she had an alcohol problem. Grandmother testified that she no longer drinks.

Grandmother testified that she cheated the drug test by washing her hair ten times. Grandmother stated she did so because she had taken one of her old pain pills for a toothache and feared she would not get custody of the children if it showed up after the drug test. Grandmother noted that she did not use methamphetamine until after she was appointed PMC. Grandmother noted that she only used methamphetamine one time, and she used it in the bathroom while the children were outside. Grandmother denied that Mother and Father knew she falsified the drug test.

Grandmother testified that she had to turn to Mother and Father for childcare due to the hours she worked because she could not afford daycare. Grandmother denied, however, that Mother and Father continued to live with her when she was appointed PMC.

Grandmother testified that J.S., who was the son of a friend, stayed with her for only five days. Grandmother testified that she knew J.S. had "a few mental problems," but she denied knowing that he used drugs. Grandmother also denied that J.S. slept in

the same room as the children or was ever left to watch the children alone. Grandmother testified that she did not believe that the children were exposed to methamphetamine while staying with her, but through their exposure to Father. Grandmother admitted that she knew Father was using drugs during the time she allowed him to have unsupervised visits with the children.

Grandmother testified that she had a "rocky" relationship with Mother, but could not cut her from her life because she wanted to maintain a relationship with M.K. and E.K. Grandmother noted that her poor relationship with Mother also affected her relationship with Father because he was always in the middle. Grandmother testified that the testimony of the police officers regarding her physical altercations with Mother was accurate.

Grandmother testified that she attempted to help with M.K. and E.K. after they were placed with the foster family but was unsuccessful. Grandmother noted that M.K. was giving the foster family trouble because she wanted to come home. Grandmother denied intentionally saying inappropriate things to the children during the supervised visitations and noted that she corrected any issues when admonished by the Department.

*Discussion*

A.     Father's Commission of Predicate Violations. As noted, Father challenges the legal and factual sufficiency of the evidence supporting the jury's findings that he committed the predicate violations alleged by the Department, that termination was in the best interest of the children, and that his parental rights should be terminated.

Termination under subsection 161.001(b)(1)(D) requires clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Termination under subsection 161.001(b)(1)(E) requires clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). Because the evidence relevant to sections 161.001(b)(1)(D) and (E) is somewhat interrelated in this case, we will address these grounds together. *See In re S.R.*, 452 S.W.3d 351, 359-60 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Both subsections require proof of endangerment, which means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). While "endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* Further, the danger to a child may be inferred from parental misconduct. *Id.*

> When the termination is based on (D), the endangerment analysis
>
> focuses on the evidence of the child's physical environment, although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Section D permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d at 477. Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *Id.* (citing *In re Tidwell*, 35 S.W.3d 115, 119–20 (Tex. App.—Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain knowledge that one of the . . . offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by . . . leaving the children in that environment.")). In considering whether to terminate parental rights, the court may look at parental conduct both before and after the birth of the child. *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no pet.). Section D permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d at 367.

*Jordan*, 325 S.W.3d at 721.

When termination is based upon (E), the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the direct result of the parent's or another's conduct, including acts, omissions, or failures to act. *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83–84 (Tex. App.—Dallas 1995, no writ).

Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. [*In re*] *J.T.G.*, 121 S.W.3d [117,] at 125 [(Tex. App.—Fort Worth 2003, no pet.)]; *see also* TEX. FAM. CODE ANN. § 161.001[(b)](1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

*In re T.T.F.*, 331 S.W.3d 461, 483 (Tex. App.—Fort Worth 2010, no pet.).

As previously noted, Father was incarcerated, used illegal narcotics, and engaged in criminal behavior during a large part of the children's lives. Incarceration by itself does not "constitute engaging in conduct that endangers the physical or emotional well-being of the child." *Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Evidence of imprisonment, however, may be considered with other evidence to establish that the parent has engaged in a course of conduct which has the effect of endangering the child, and collectively such evidence can support a finding to this effect. *In re S.T.*, 263 S.W.3d 394, 401 (Tex. App.—Waco 2008, pet. denied). "[E]vidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child." *In re S.R.*, 452 S.W.3d at 360-61; *see also In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child.").

Father continued to engage in criminal activity after he was paroled and after the children were removed from his custody. Father was charged with three offenses after the children were initially removed in January, and he was arrested in September after the children were removed the second time. "[A] court may consider evidence establishing that a parent continued to engage in endangering conduct after the child's removal by the Department or after the child no longer was in the parent's care, thus showing the parent continued to engage in the course of conduct in question." *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

Father also admitted to the continued use of methamphetamine and heroin after his conviction and parole in Louisiana and after the children were removed from his custody. A parent's use of illegal drugs, and its effect on his or her ability to parent, may qualify as an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). *See also In re M.R.R.*, No. 10-15-00303-CV, 2016 WL 192583, at *5 (Tex. App.—Waco Jan. 14, 2016, no pet.) (mem. op.) ("A parent's continued drug use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child.").

The jury could reasonably conclude that Father's drug use and criminal behavior resulted in the children being placed in a dangerous environment that would continue after his incarceration if the children were returned to his custody and that he engaged in a course of conduct that was a danger to the children and would continue to engage in such a course of conduct in the future if the children were returned to his custody.

The jury could also have concluded that Father agreed to have Grandmother appointed PMC even though he knew that Grandmother used methamphetamine and abused alcohol, that Grandmother falsified a drug test, and that she was not a safe caretaker for the children.

Given the record, we conclude that the evidence of Father's drug use, which resulted in the children testing positive for methamphetamine and heroin, his multiple incarcerations, and his continued drug use, viewed in the light most favorable to the jury's findings regarding subsections (D) and (E), was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that Father

engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the findings regarding subsections (D) and (E) or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction that the elements of subsections (D) and (E) were shown. Accordingly, we hold that the evidence was legally and factually sufficient to support the jury's findings in relation to subsections (D) and (E). We overrule Father's third and fourth issues. [3]

B. Removal of Grandmother as Managing Conservator. Grandmother argues that the affidavit in support of her removal was insufficient. Specifically, she argues that the Department failed to file the required supporting affidavit within one year of the children's removal. However, any argument Grandmother may have about the affidavit is waived as she did not object to any deficiency in the trial court. In order to preserve a complaint for appellate review, the complaining party must present the complaint to the trial court by way of timely request, objection, or motion. TEX. R. APP. P. 33.1(a)(1)(A). A reviewing court will not consider errors, even those of constitutional magnitude, that were not called to the trial court's attention. *In re J.C.*, 594 S.W.3d 466, 473 (Tex. App.—Fort Worth 2019, no pet.); *see also Miles v. Jerry Kidd Oil Co.*, 363 S.W.3d 823, 828 (Tex. App.—Tyler 2012, no pet.). Because the issue was not preserved, we overrule Grandmother's second issue.

---

[3] Because we find the evidence factually and legally sufficient to support violations of (D) and (E), we need not address the sufficiency issue as to (Q).

Grandmother next argues that the Department failed to prove any material or substantial change of circumstances since entry of the final order less than three months before the children were removed from her custody.

A conservatorship order may be modified if "the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed" since the date of rendition of the conservatorship order and if modification is in the child's best interest. TEX. FAM. CODE ANN. § 156.101(a)(1). In our review of the sufficiency of the evidence, we are mindful that the jury is not confined to rigid or definite guidelines in deciding whether a material and substantial change of circumstances occurred. *In re A.L.E.*, 279 S.W.3d 424, 428 (Tex. App.—Houston [14th Dist.] 2009, no pet.). This determination is fact-specific and must be made according to the unique circumstances of the case. *Id.*

The evidence presented at trial, viewed as a whole and in the light most favorable to the judgment, reflects the following changes in circumstances that occurred after Grandmother was appointed PMC: (1) M.K. and E.K. tested positive for methamphetamine, and E.K. also tested positive for heroin: (2) Grandmother admitted using methamphetamine in the bathroom that the children used; (3) Grandmother tested positive for methamphetamine after a drug test; (4) Grandmother allowed J.S. to move into the residence with her and the children knowing that J.S. had mental health issues and used methamphetamine and heroin; (5) Grandmother allowed J.S. to babysit the children and sleep in their bedroom; and (6) Grandmother allowed the children

unsupervised visitation with Mother and Father knowing that both used methamphetamine and that Father was a heroin addict.

"Changes in a child's home surroundings or circumstances rendering a conservator unsuitable are examples of the material and substantial changes contemplated by section 156.101(a)(1)." *In re J.R.P.*, 526 S.W.3d 770, 779 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Illegal drug use can constitute a material and substantial change. *In re S.G.C.-G.*, No. 05-18-00223-CV, 2019 WL 1856621, at *5 (Tex. App.—Dallas Apr. 25, 2019, no pet.) (mem. op.); *see also In re K.D.B.*, No. 01-18-00840-CV, 2019 WL 4065276, at *9 (Tex. App.—Houston [1st Dist.] Aug. 29, 2019, no pet.) (mem. op. on rehr'g.).

After viewing all of the evidence in the light most favorable to the jury's finding, we conclude that the evidence was sufficient by a preponderance of the evidence that a reasonable factfinder could have formed a firm belief or conviction that a material and substantial change in circumstances occurred. We also conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the jury's finding that a material and substantial change in circumstances had occurred or that the disputed evidence was not so significant that the jury could not reasonably have formed a firm belief or conviction that a material and substantial change in circumstances had occurred. Therefore, after considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the jury's finding that a material and substantial change in circumstances occurred. We overrule Grandmother's first issue.

C.  Best Interest of the Children.  Father asserts that the evidence is legally and factually insufficient to support a finding that termination of his parental rights is in the best interest of the children.  Mother asserts that the evidence is factually insufficient to support a finding that termination of her parental rights is in the best interest of the children.  Grandmother argues that the evidence is legally and factually insufficient to support a finding that removal of her as permanent managing conservator is in the best interest of the children.

In either a termination or a conservatorship proceeding, the jury must determine whether termination of a parent's rights or removal of a conservator is in the best interest of the child.  *See In re C.V.L.*, 591 S.W.3d 734, 753 (Tex. App.—Dallas 2019, pet. denied) (termination); *In re A.L.H.*, 515 S.W.3d 60, 79 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (modification).  "There is a strong presumption that the best interest of a child is served by keeping the child with a parent."  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); TEX. FAM. CODE ANN. § 153.131(b).  "Prompt, permanent placement of the child in a safe environment is also presumed to be in the child's best interest."  *In re L.N.C.*, 573 S.W.3d 309, 315 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); TEX. FAM. CODE ANN. § 263.307(a).  The focus of the best interest analysis is what is best for the child, not what is best for the parent or any other party.  *See C.V.L.*, 591 S.W.3d at 753.

In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the

programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list is not exhaustive, but simply indicative of factors that have been or could be pertinent. *Id.* at 372; *A.L.H.*, 515 S.W.3d at 79.

The court does not require evidence on each factor in order to make a valid finding as to the child's best interest. *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *A.L.H.*, 515 S.W.3d at 79. "[A] single factor may be adequate in a particular factual situation to support a finding that termination [or the removal of a conservator] is in the best interest of the child." *J.M.T.*, 519 S.W.3d 268. Evidence relevant to establishing the predicate violations under § 161.001(b)(1) also is frequently relevant to determining the best interest of a child. *In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

> Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is prologue."); *see also In re A.M.*, 385 S.W.3d 74, 82–83 (Tex. App.—Waco 2012, pet. denied) (concluding that evidence of mother's history of neglecting and endangering children by exposing them to domestic violence supported the trial court's finding that termination was in the child's best interest). Evidence of a recent improvement does not absolve a parent of a history of irresponsible choices. *See Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.); *see also In re T.C.*, No. 10–10–00207–CV, 2010 Tex. App. LEXIS 9685, at *20, 2010 WL 4983512 (Tex. App.—Waco Dec. 1, 2010, pet. denied) (mem.op.).

*In re M.R.R.*, 2016 WL 192583, at *6.

1.  The desires of the children.  No testimony regarding the desires of either child was introduced, although Mother, Father, and Grandmother testified that the children loved them all.

At the time of trial, M.K. was five years old, and E.K. was four years old.  Except for the two weeks after she was born, M.K. spent the first few months of her life being cared for by Father and Grandmother while Mother was in jail.  During the majority of their lives, either Mother or Father was incarcerated or involved in the distribution and use of illegal narcotics and other criminal behavior.

Although the children appeared to enjoy visitations with Grandmother, the caseworker and the foster mother testified that their behavior after such visits regressed to their pre-placement levels.  The children never expressed a desire to see Grandmother before or after their visits.  Grandmother also ignored the guidelines set by the Department when she brought the children sugary snacks, talked with them about inappropriate topics, and showed up smelling of alcohol.

At the time of trial, M.K. and E.K. had spent seventeen months in foster care.  The caseworker, the court appointed special advocate and ad litem ("CASA"), and the foster mother testified that the children are bonded to their foster family.  The children call their foster mother "mom," and refer to Mother and Father by their given names. The children do not express a desire to see Mother, Father, or Grandmother.  The caseworkers, ad litem, and foster mother testified that the children have thrived while in foster care.  E.K. is receiving ongoing therapy for his speech problems, and both children are behaving better at home and at school.

"When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re S.R.*, 452 S.W.3d at 369; *see also In re A.W.*, 444 S.W.3d 690, 693-94 (Tex. App.—Dallas 2014, pet. denied) (children did not testify, but court found their desires through evidence that children were happy with their foster placement and did not mention their mother as frequently at time of trial).

This factor weighs in favor of the jury's best interest determinations.

2.    Emotional and Physical Needs of the Children and Danger to the Children Now and In the Future.  The evidence that relates to Father's violation of (D) and (E) supports a finding that he is unable to meet the emotional and physical needs of the children and will be unable to do so in the future and that he is a danger to the children and will also be such in the future.  Mother does not contest the sufficiency of the evidence related to her violation of the predicate violations, thus supporting a finding that she is also unable to meet the emotional and physical needs of the children and will be unable to do so in the future and that she is a danger to the children and will continue to be so in the future.  The evidence related to Grandmother's behavior also supports the jury's determination that she is unable to meet the emotional and physical needs of the children and will be unable to do so in the future and that she is a danger to the children and will continue to be so in the future.

Both parents used illegal narcotics, had multiple incarcerations, and participated in criminal activity both before and after the children were removed from their custody. Mother, Father, and Grandmother used methamphetamine around the children.  Father

used heroin in the bathroom of a hotel room while the children were present. The factfinder can give great weight to drug-related conduct. *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.). *See also In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.). Illegal drug use is a circumstance that can contribute to an unstable lifestyle and is relevant in determining present and future danger to a child's physical and emotional well-being. *In re N.J.H.*, 575 S.W.3d 822, 832 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *see also In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) (while generally considered in relation to predicate violations, also relevant in determining whether parent poses present or future risk of physical or emotional danger to child). Continued drug use can also demonstrate an inability to provide for a child's emotional and physical needs. *In re M.R.R.*, 2016 WL 192583, at *5; *see also In re K.B.*, No. 05-17-00428-CV, 2017 WL 4081815, at *4 (Tex. App.—Dallas Sept. 15, 2017, no pet.) (mem. op.) ("continued use of illegal drugs in the face of the threat of a parent's loss of his parental rights is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers the child's well-being."). A factfinder may reasonably infer from past conduct that endangers a child's well-being that similar conduct will recur if the child is returned. *In re W.S.*, No. 10-17-00318-CV, 2018 WL 1528460, at *4 (Tex. App.—Waco Mar. 28, 2018, no pet.) (mem. op.); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue.").

Mother argues that despite testing positive for methamphetamine and heroin, the Department offered no evidence of any actual harm to the children from that exposure.

A parent's failure to remain drug free in the children's presence presents a danger to them, whether or not there is evidence of "actual" harm. *See In re K.O.*, 488 S.W.3d 829, 841 (Tex. App.—Texarkana 2016, pet. denied); *see also In re A.F.F.*, No. 14-17-00394-CV, 2017 WL 4697836, at *21 (Tex. App—Houston [14th Dist.] Oct. 19, 2017, no pet.) (mem. op.) (child testing positive for methamphetamine was a ground supporting finding that termination was in child's best interest).

Father argues that the Department should be estopped from presenting evidence in relation to the termination of his parental rights that predates the conservatorship order of June 27, 2018. As this issue was not raised in any pleading before the trial court, it is waived. *See* TEX. R. CIV. P. 94. Additionally, such evidence is permissible under § 161.004 of the Family Code. *See* TEX. FAM. CODE ANN. § 161.004.

Additionally, Mother, Father, and Grandmother were involved in domestic violence incidents while the children were present. On at least three occasions, the police were called to intervene. Two occasions involved Grandmother and Mother, while Father was present on another occasion. Father and Mother also testified that that they had a "rocky" relationship. There was no evidence that the children were victims of domestic violence on those occasions. However, violence committed in a child's presence constitutes a course of conduct that can endanger a child's physical and emotional well-being. *See In re H.N.J.*, No. 10-10-00365-CV, 2011 WL 2937473, at *3 (Tex. App.—Waco July 13, 2011, no pet.) (mem. op.). Again, the factfinder may infer from past conduct endangering the children's well-being that similar conduct will recur if the child is returned. *Ray*, 832 S.W.2d at 435.

The foster parents provide the children a safe and stable environment. They have seen to the children's physical needs and have ensured that they have received counseling. The foster parents also enrolled E.K. in speech therapy. The foster mother testified that she would attempt to maintain the relationship that existed between M.K. and E.K. and their paternal cousins.

This factor weighs in favor of the jury's best interest determinations.

3. Parental Abilities of the Individual Seeking Custody. There is no evidence that the foster parents possessed inadequate parental abilities. As previously noted, the children have thrived while in their care.

Mother, Father, and Grandmother showed a lack of parental abilities while the children were in their custody, exposing the children to illegal narcotics and criminal behavior. Mother has been through Department counseling and programs twice with T1 and T2, yet still exhibits the poor parenting skills she exhibited when she was first in contact with the Department. Mother has completed a number of self-improvement and parenting courses while incarcerated but is unable to demonstrate an ability to parent outside of incarceration. Father also completed a number of parenting and self-improvement courses while incarcerated but is also unable to demonstrate an ability to parent outside of incarceration. Grandmother's drug use and failure to protect the children while in her custody also shows a lack of parenting skills.

This factor weighs in favor of the jury's best interest determinations.

4. Plans for the Children. The Department's plan is to terminate the parental rights of Mother and Father, to remove Grandmother as PMC, to have the

Department appointed PMC, and to finally have the children adopted by their foster parents.

The foster mother testified that she and her husband plan to adopt M.K. and E.K. if parental rights are terminated. The foster mother testified that she and her family love the children "immensely," and that the children "deserve to be happy and loved and protected most of all," which they have been and will continue to be with the foster family.

Father's plan for the children is for them to be cared for, first, by an aunt, second, by his mother, and third, by Mother who plans to reside with T1's and T2's paternal aunt. Father then plans to reconnect with the children once he is released from prison. Father noted that he has no plan to be involved with drugs again and plans to avoid any people involved with drugs. Father testified about the history of one of his stepfathers who was also incarcerated for drugs but managed to turn his life around. Father noted that he talks to the stepfather all the time, which gives him hope that he can also turn his life around.

Father testified that he loves his children and does not want his or Mother's parental rights terminated or for Grandmother to be removed as PMC. Father believes the children will be safe with Grandmother while Mother and Father are still incarcerated because Grandmother has taken steps to change. Father acknowledged that he made mistakes, is not trying to blame others, and takes responsibility for his actions. Father testified that he is trying to do everything he can to better himself in the future.

Mother testified that once she is released from prison, she intends to live with M.K. and E.K. with the paternal aunt. The paternal aunt is not related to Mother or to M.K. and E.K. One of the caseworkers and the CASA testified that the paternal aunt declined to take placement of M.K. and E.K. because she did not have the room and because she is already caring for T1 and T2 as well as her own three children. The paternal aunt testified that she is willing to care for M.K. and E.K. and to provide a place for Mother to live after her incarceration.

Grandmother initially testified that if the children were returned to her, she did not know her plan, but the children would probably each share a room with one of Sister's children. Grandmother also noted that Sister and her family would be a good support system and that E.K. could attend the daycare where Sister teaches and where one of Sister's children attends. Grandmother further noted that she wants the children returned to Mother if Mother's and Father's paternal rights are not terminated. Grandmother further noted that her supervision and parenting of the children will be different if she remains PMC because she has received "a lot of help" since the children were removed. Grandmother testified that she completed a course of individual and group counseling at the treatment facility selected by the Department. Grandmother also began attending a church that offered counseling.

Grandmother testified that Mother is a "really good mom" and that Grandmother wants Mother and Father to eventually get custody of the children when Mother and Father are released from prison.

The plans for the children weigh in favor of the jury's best interest determinations.

5. Stability of the Home. It is undisputed that the foster parents have a stable home.

As both Mother and Father were incarcerated at the time of trial, it is mere supposition that they will have stable living situations when they are released.

Mother testified that the paternal aunt of T1 and T2 will permit her and the children to live with the paternal aunt's family and that the paternal aunt will assist with employment and transportation. The paternal aunt testified that she believes Mother will be a safe and stable parent for the children, although Mother did not disclose to her that M.K. and E.K. had tested positive for methamphetamine and heroin. One of the Department caseworkers confirmed that the paternal aunt's home is stable and appropriate for M.K. and E.K.

Mother testified that she has taken numerous classes while incarcerated, obtained her GED, and had a spiritual awakening. Mother believes that all of the classes she has taken have given her the abilities to effectively parent her children. Mother testified that she planned to "be there" for her children both emotionally and physically. Mother also testified that once she is paroled, she will continue going to counseling and AA.

Father's paternal aunt testified that the Department contacted her about becoming the children's placement, but she was unable to do so at that time. Father's aunt testified that she told the Department she would be open to placement if her situation changed. The aunt testified that she left messages with the Department regarding her willingness to be the children's placement, but that no one from the Department called her back. The aunt also testified that she has not seen M.K. and E.K. for over two years. The CASA and

ad litem testified that she attempted to follow-up with Father's paternal aunt, but she was unable to reach her or leave a message.

One of the caseworkers testified that the Department had considered several of Mother's and Father's family members as possible placements for the children without success. The paternal aunt with whom T1 and T2 resided was considered, but the Department was unable to conduct a home study because the paternal aunt declined placement due to her lack of room for the children. The CASA and guardian ad litem also testified that the paternal aunt indicated to her that she would not be able to be the children's placement. The paternal aunt denied that she told anyone from the Department that she declined the placement or did not have room for the children. The paternal aunt testified that she told the Department caseworkers that she wanted to be the children's placement but that no one from the Department ever got back with her.

Grandmother testified that she had two jobs and a stable residence. Grandmother's daughter and family were living with her, but Grandmother testified there was sufficient room for M.K. and E.K. The caseworker testified that the Department had no concerns about the home's condition.

This factor weighs in favor of the jury's best interest determinations.

6. Any Excuse for the Acts or Omissions of the Individual Seeking Custody. Out of the three Appellants, Father was the only one who took responsibility for his part in the acts that led to the children's removal. Mother and Grandmother minimized any acts they committed, and they blamed their problems and the situation with the Department on others.

Grandmother blamed the Department for her inability to properly care for the children. Grandmother testified that the initial caseworker promised that she would have assistance in housing, medical care, food, childcare and income from the Department if she took responsibility for the children., but the Department did not do so. Grandmother further testified that she did not recall any agreement with the Department to make sure Mother and Father entered drug treatment or were not taking drugs. Grandmother accepted that the children were exposed to drugs while in her care and noted that she exposed them to drugs by letting them go unsupervised with Mother and Father who she knew were using drugs.

During the time Father was arrested and sent to prison in Louisiana, Father's father became ill and passed away. Father testified that he did not possess the skills to deal with the situation and admitted that getting back into drugs probably was not the best coping mechanism.

In a letter to Mother, Father best summed up the situation:

You don't think that it would be better for the kids to be in a stable drug free environment. I mean I don't want them with my mom, but your mom is no better. At least now they arnt around any drugs. The only reason I don't want them staying where they are is because that bitch will try to strip us of our rights and never let us see our kids again. And for good reason . . . Cause I'm sorry to say we are both pieces of shit for what we have done. I mean yeah we are sorry for it now and we wish we could take it back and we will never do it again but look at the fucking facts . . . both our kids had drugs in their system. They were taken from us once and we were given a chance to do the right thing but we did the oppisite! We got worse! Yes we love our children and yes we took care of our children but in the eyes of the law and every fucking body else in the world we did it the wrong way. Look at how much trouble we are in and how they are making us look. Baby its not them its us, we are in the wrong. We really are the monsters they make us out to be. Do you remember the things we did or the things

I did and you let me or the way you chose me over the kids. These mistakes we made might of cost us not only our family but a substansual number of years in prison.

This factor weighs in favor of the jury's best interest determinations.

After viewing all of the evidence in the light most favorable to the jury's findings regarding the best interest of the children, we conclude that the evidence is sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that termination of the parent-child relationship between Father and the children is in the children's best interest. We also conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the jury's findings that termination of the parent-child relationship between Mother and Father and the children is in the children's best interest or is not so significant that the jury could not reasonably have formed a firm belief or conviction that termination is in the children's best interest. Therefore, after considering the relevant factors under the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the jury's findings that termination of the parent-child relationship between Father and Mother and the children, M.K. and E.K., is in the children's best interest. We overrule Mother's sole issue and Father's first and second issues.[4] [5]

---

[4] Mother also refers to the statutory requirements under § 263.307(b) of the Family Code. *See* TEX. FAM. CODE ANN. § 263.307(b). The evidence is also factually sufficient to support a best interest finding under § 263.307(b).

[5] Because the evidence is legally and factually sufficient to support the jury's findings that Father committed the predicate violations and that termination was in the children's best interest, we overrule Father's fifth and sixth issues that the evidence is legally and factually insufficient to support the jury's findings that Father's parental rights should be terminated as to M.K. and E.K.

After viewing all of the evidence in the light most favorable to the jury's findings regarding the best interest of the children, we conclude that the evidence is sufficient by a preponderance of the evidence for a reasonable factfinder to have a formed a firm belief or conviction that removal of Grandmother as permanent managing conservator is in the children's best interest. We also conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the jury's findings that removal of Grandmother as permanent managing conservator is in the children's best interest or is not so significant that the jury could not reasonably have formed a firm belief or conviction that removal of the Grandmother as permanent managing conservator is in the children's best interest. Therefore, after considering the relevant factors under the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the jury's finding that removal of Grandmother as permanent managing conservator over the children, M.K. and E.K., is in the children's best interest. We overrule Grandmother's third issue.

### *Conclusion*

Having found no reversible error, we affirm the judgment of the trial court.


REX D. DAVIS
Justice

Before Chief Justice Gray,*
      Justice Davis, and
      Justice Neill
      *(Chief Justice Gray concurs in the court's judgment.  A separate opinion will not issue.)
Judgment affirmed
Opinion delivered and filed August 14, 2020
[CV06]

